**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

STATE OF DELAWARE          )
                                     )
      v.                          )     I.D. Nos.     2205004014
                                     )                       2205002785
                                     )
JOSEPH ROSARIO,         )
                                     )
           Defendant.      )

**MEMORANDUM OPINION DENYING MOTION TO SEVER**

Defendant Joseph Rosario filed a Motion to Sever (the "Motion"). The Motion seeks to sever multiple charges into three separate cases involving "complaining witnesses" A.F., K.J. and A.C.[1] Without severance, Mr. Rosario contends that: (i) there is a distinct and real chance that the jury will cumulate evidence to find him guilty; and (ii) the jury may use the evidence of one of the crimes to infer a general criminal disposition of Mr. Rosario and find him guilty of other crimes. The State of Delaware opposes the Motion. The State filed its State's Response to Defendant's Motion to Sever (the "Response"). The State contends that Mr. Rosario cannot meet his burden on demonstrating that substantial injustice would result from a joint trial.

The Court has reviewed the Motion and the Response. The Court has also reviewed the law as it relates to Criminal Rule 8 and Criminal Rule 14. The Court has determined that a hearing on the Motion and the Response are not necessary. For the reasons set forth below, the Court **DENIES** the Motion.

---

[1] A.F., K.J. and A.C. are all minors. The Court will use their initials and not their full names for purposes of this decision.

**BACKGROUND**

The Response provides a proffer of what the State intends on proving at trial.[2] On March 26, 2021, New Castle County Police Department received a rape report. The report was that Mr. Rosario raped A.F on March 23, 2021. A.F. was 11 years old on March 23, 2021.

The Child Advocacy Center interview A.F. A.F. reported that one day after school her aunt ('Aunt") and Mr. Rosario picked up A.F. and other children and went to Banning Park. Aunt is Mr. Rosario's girlfriend. Everyone got out of the van except A.F. and Mr. Rosario. A.F. reported that Mr. Rosario then drove the van to another location at Banning Park. The location was surrounded by trees. A.F. stated that she was in the back seat and Mr. Rosario was in the front seat. Mr. Rosario placed a blanket and his jacket over the van's windows. A.F. said that Mr. Rosario made her take off her clothes. Mr. Rosario then placed A.F.'s fabric mask over her eyes. Mr. Rosario then placed his fingers on the outside of her vagina and "play[ed] with it." A.F. tried to back away and Mr. Rosario told her that the more she moved away, "the more it's going to take." Mr. Rosario also said to A.F. that he would stab her with a knife if she told anyone. A.F. described the knife as a machete. A.F. believed that the knife was in a drawer in Aunt's room.[3]

A.F. explained that Mr. Rosario had touched her vagina with his fingers in the van on a previous occasion. This event allegedly occurred at Cab Calloway School. A.F., Mr. Rosario, and her brother went to her brother's concert at Cab Calloway School. A.F. said that the "same exact thing" happened in Cab Calloway School's parking lot.[4]

---

[2] Resp. at 1-7.
[3] Indictment, Counts IV-VII.
[4] Indictment, Counts I-III.

A.F. described that Mr. Rosario usually makes her "strip" and that she cries and begs for him not to do it. A.F. stated that Mr. Rosario covers A.F.'s eyes when this occurs. Mr. Rosario is purportedly not wearing any pants during the event. A.F. does not know how Mr. Rosario gets his pants off because her eyes are covered; however, A.F. says she knows Mr. Rosario is not wearing pants because she feels his skin.

Mr. Rosario resides at 711 Woodtop Road, Wilmington (the "Residence"). Aunt lives with Mr. Rosario, her two sons, her father ("Father") and her mother ("Mother"). In 2021, Mother worked as a Home Health Aide to a minor child, S.J. In 2021, S.J. was 7 years old. S.J. suffers from cerebral palsy. A.C. and K.J. are two of S.J.'s siblings. In 2021, A.C. was 10 years old and K.J. was 5 years old. S.J. and K.J. would go to the Residence 2 to 3 times per week. A.C. would occasionally go to the Residence.

On September 22, 2021, Mother picked up A.C., S.J. and K.J. and took them to the Residence. A.C. said that Mother then took S.J. to therapy. A.C., K.J., two of Aunt's children and Mr. Rosario stayed at the Residence. A.C. explained that Aunt was at the store and Father was at work. A.C said that she was in the living room when Mr. Rosario called to her. A.C. went to Mr. Rosario's bedroom. Mr. Rosario then asked her if her brothers ever touched her. Mr. Rosario said that K.J. lies and stated that A.C.'s brothers touch her. Mr. Rosario then took a blindfold and placed it over her head. A.C. explained that she was scared when Mr. Rosario put the blindfold on her and did not know what to do. A.C. described the blindfold as multi-colored, with purple, pink and brown colors and a "weird" texture. After the blindfold was on, A.C. could only see light from the T.V. in the bedroom.

A.C. said that Mr. Rosario then said, "let's play a game." Mr. Rosario told her to go " back and forth" and "down." A.C. stated that Mr. Rosario told her to go on to the ground.

3

A.C. refused. A.C. stated she took off the blindfold, left the bedroom, and then went back into the living room with her sister. A.C. said that Mr. Rosario then went into the kitchen and called to A.C. to come into the kitchen. A.C. did not go into the kitchen and remained in the living room. Mr. Rosario then sent A.C. and Aunt's other two children outside but told K.J. to stay inside and help Mr. Rosario clean the Residence.[5]

Whild A.C. was outside, Aunt returned from the store. A.C. told Aunt what happened. A.C. stated that Aunt did not believe her and called A.C. a liar. When Mother came home, A.C. told Mother. Mother also did not believe A.C. A.C.'s mother said that when Mother brought the three children home, Mother was yelling at A.C. and A.C. ran to hug A.C.'s father. Mother told A.C.'s mother that nothing happened. A.C. then told A.C.'s mother that Mr. Rosario made her get on the ground. A.C.'s mother then asked K.J. if anything happened with Mr. Rosario. A.C.'s mother said that K.J. explained that Mr. Rosario touched A.C's "pee-pee." A.C.'s mother then called the police. After placing the call, A.C.'s mother took A.C., S.J. and K.J. to the hospital.

A Forensic Nurse Examiner ("FNE") examined K.J. at the hospital. The FNE noted that K.J. continually placed her hands on her labia majora and clitoral hood. The FNE reported that K.J. was also eager to assist in performing separation of the labia majora during the exam. K.J. also laid back on the stretcher and stated "[K.J.] close your eyes," and "close your eyes, [K.J.]." The FNE asked K.J. why she made those statements. The FNE stated that K.J. said "that's what [Mr. Rosario] tells me to do. He does bad things."

The Child Advocacy Center interviewed K.J. K.J. said that Mr. Rosario "tackled" her, scratched her, and tricked her which led to him "digging" in her butt with his hand. K.J. stated

---

[5] Indictment, Count XX.

4

that Mr. Rosario made her look where his pee comes from, which is his "pee-pee." K.J. said that Mr. Rosario told K.J. that his penis is a lollipop and that Mr. Rosario tricked her because it is not a lollipop. K.J. used anatomical drawings and identified the vagina as "pee-pee" on the female diagram. K.J. identified the penis on the male diagram and identified the penis as the "pee-pee" and the testicles as "jingle bells."

K.J. explained that Mr. Rosario told her to get on the floor and that he put a blindfold on her eyes and turned the lights off. K.J. described the blindfold as black and that she could not see. K.J. stated that this occurred in Mr. Rosarios's bedroom at the Residence. K.J. said that Mr. Rosario licked her pee-pee, dug into her pee-pee, and took her clothes off. K.J. stated that Mr. Rosario liked her pee-pee and that she did not want him to lick anywhere on her body. K.J. also said that she licked his pee-pee with her tongue because Mr. Rosario licked her pee-pee. K.J. explained that licking Mr. Rosario's penis was "nasty." K.J. said that "juice" came out of Mr. Rosario's pee-pee, and he put it in the sink. K.J. demonstrated what Mr. Rosario would do to make the "juice" come out by moving her hand up and down in a motion of male masturbating.[6]

The New Castle County Police Department then executed a search warrant at the Residence. NCCPD police noted that the layout of the bedroom matched a drawing made by A.C. during her interview at the Child Advocacy Center. According to the State, the NCCPD police also found, as part of the search, several torn fabrics and a multicolored headwrap in a drawer in Mr. Rosario's bedroom.

### THE INDICTMENT

The State charged Mr. Rosario with crimes against all three victims. On July 25, 2022,

---

[6] Indictment, Counts VIII-XIX.

the State had the charges joined when the Grand Jury indicted Mr. Rosario on seven counts of sexual abuse. Counts I-VII relate to crimes related to A.F. Counts VII-XIX of the indictment relate to K.J. Finally, Count XX is a count of Endangering the Welfare of a Child as it relates to A.C. The relevant dates set out in the indictment are: (i) September 1, 2019 through March 26, 2021 for Counts I-III; March 23, 2021 for Counts IV-VII; (iii) March 1, 2021 through September 21, 2021 for Counts VIII through XIX; and (iv) September 21, 2021 for Count XX.

## DISCUSSION

Criminal Rule 8 provides in part:

(a) Joinder of offenses. Two or more offenses may be charged in the same indictment ... in a separate count for each offense if the offenses charged are of the same or similar character or are based on the same act or transaction or on two or more transactions connected together or constituting parts of a common scheme or plan.[7]

A motion for severance is addressed to the sound discretion of the trial court.[8] The ruling of the trial court in denying a motion for severance will not be reversed except for a clear abuse of discretion.[9] The rule relating to joinder is designed to promote judicial economy and efficiency.[10]

Similar offenses committed by the same defendant on different dates may be joined for trial, provided that the "offenses are of the same general character, involve a similar course of conduct and are alleged to have occurred within a brief span of time ..."[11] Where the offense charged are of the same general nature and give evidence of a *modus operandi,* severance has been denied, even in the face of obvious prejudice to the defendant.[12]

---

[7] Super. Ct. Crim. R. 8.
[8] *See Lampkins v. State,* 465 A.2d 785 (Del. 1983); *Younger v. State,* 496 A.2d 546 (Del. 1985).
[9] *See Burton v. Sate,* 149 A.2d 337 (Del. 1959).
[10] *See Mayer v. State,* 320 A.2d 713 (Del. 1974).
[11] *Younger v. State,* 496 A.2d at 550; *see also State v. Ellis,* 375 A.2d 473, 474 (Del. 1977).
[12] *Brown v. State*, 310 A.2d 870 (Del. 1973).

In *Skinner v. State,*[13] the Supreme Court held that the trial court had not abused its discretion in denying a motion to sever various counts of robbery and murder occurring at three different times. The Supreme Court found that the mere fact that the crimes were separate and were committed against different individuals over a period of time does not require severance.[14]

Criminal Rule 8 is read in conjunction with Criminal Rule 14. Criminal Rule 14 provides, in pertinent part:

> If it appears that a defendant or the State is prejudiced by a joinder of offenses ... in an indictment ... for trial together, the court may order an election or separate trials of counts ... or provide whatever other relief justice requires.

The defendant bears the burden of demonstrating substantial injustice and unfair prejudice from denial of a motion to sever.[15] Mere hypothetical prejudice from denial is not sufficient.[16] There are three types of prejudice a defendant may suffer from a joinder of offenses: (1) the jury may cumulate evidence of the various crimes charged and find guilt when, if considered separately, it would not so find; (2) the jury may use evidence of one of the crimes to infer a general criminal disposition of the defendant in order to find guilt of the other crime or crimes; and (3) the defendant may be subject to embarrassment or confusion in presenting different and separate defenses to different charges.[17]

Here, Mr. Rosario contends that denial of his request for severance will result in prejudice. Mr. Rosario suggests that the number of charges will make it impossible for a jury to resist cumulating evidence. Further, Mr. Rosario asserts that the jury may use evidence of one of the alleged crimes to infer a general criminal disposition of the defendant to find guilt with

---

[13] 575 A.2d 1108 (Del. 1990).
[14] *Id.* (citing *McDonald v. State*, 307 A.2d 796, 798 (Del. 1973)); see also *Younger*, 496 A.2d at 550.
[15] *Bates v. State,* 386 A.2d 1139, 1141 (Del. 1978); *Lampkins v. State,* 465 A.2d at 794.
[16] *Bates v. State,* 386 A.2d at 1142; *Younger v. State,* 496 A.2d at 550.
[17] *State v. McKay,* 382 A.2d 260, 262 (Del. 1978); *Weist v. State,* 542 A.2d 1193, 1195 (Del. 1988); *see also Drew v. United States,* 331 F.2d 85 (D.C.Cir.1964).

regard to other alleged offenses. Mr. Rosario notes that the acts alleged in Counts I-VII are separate and distinct acts from those alleged in Counts VIII-XX.

The State contends that the charges, while involving three different children, are connected by time, place and similarity of conduct. Furthermore, considering the investigation and identification of each child was identified, the State contends that proof of the crimes against each child is inextricably intertwined. The State also notes that, in this situation, evidence involving the crimes against one child might be admissible at the trial of another child under Evidence Rule 404. Evidence Rule 404(b) permits consideration of "evidence of other crimes, wrongs or acts…for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The State contends that evidence of prior crimes is admissible so long as such evidence is relevant and material for any purpose other than to prove that the defendant possessed a particular character, propensity or disposition to commit the charged offense and when the evidence is not unfairly prejudicial. The State contends if evidence were admissible at a separate trial, then Mr. Rosario would not suffer unfair prejudice in having a joint trial.[18]

The Court is satisfied that, based upon the State proffer of what will be shown at trial, the "common scheme or plan" requirement for a proper joinder of offenses under Criminal Rule 8(a) has been met in this case. The facts relating to timing, how the acts may have been performed, the use of blindfolding and other overlapping facts support the common scheme or plan—*i.e.*, the offenses are of the same general character, involve a similar course of conduct and are alleged to have occurred within a brief span of time.[19] Further, the Court is satisfied that, under Criminal

---

[18] *Monroe v. State*, 28 A.3d 418, 426 (Del. 2011). *See also State v. Boughner*, 1995 WL 1920095 (Del. Super. July 13, 1995).

[19] Superior Court Judge Barron engages in a helpful review of the joinder/severance cases prior to 1995.

Rule 14, Mr. Rosario will not be unduly prejudiced by such joinder.

As discussed in *State v. Boughner*,[20] the counts have independent logical relevance on the issues of intent, *modus operandi* and identity and the probative value of trying these counts together is not substantially outweighed by the danger of unfair prejudice. At trial, the Court will need to take care in instructing the jury that it may not infer a general criminal disposition on the part of Mr. Rosario from the multiplicity of charges and that the jury is not to accumulate evidence presented on these offenses in order to justify a finding of guilt as to particular offenses.

---

*Boughner*, 1995 WL 1920095, at *3 n.3. That review is helpful in guiding the Court here. Judge Barron wrote:

> It should be noted that in *Skinner,* the various crimes occurred on the same day. In *McDonald,* the various crimes were committed within hours of each other. In *Younger,* the different crimes (2 rapes and 1 attempted rape) were committed within a 2 to 3 month period. In *Ellis,* the 2 assaults occurred within 3 days of each other. *Ellis* was decided prior to the adoption of the Delaware Rules of Evidence. There, the trial court significantly noted that "where the intent with which an alleged offense is committed is a material element of the charge and such intent becomes an issue at the trial, proof of other similar offenses, within certain reasonable limit, is admissible, as tending to throw light on the intention of the accused in doing the act complained of ." *Id.* at 475. The Delaware Rules of Evidence (DRE) became effective on July 1, 1980. Among the Rules is DRE 404(b) which in certain circumstances permits evidence of other crimes, wrongs or acts to be admitted for a proper purpose, such as throwing light on the intent of the defendant. *See Pope v. State,* Del.Supr., 632 A .2d 73 (1993). Intent is an element of each of the 17 counts contained in the indictment. Under DRE 404(b), in determining whether a prior act is too remote, courts tend to employ, by analogy, the 10-year time limit contained in DRE 609(b) governing impeachment by evidence of conviction of a crime. *Allen v. State,* Del.Supr., 655 A.2d 982 (1994).

[20] *Boughner*, 1995 WL 1920095, at *6.

**CONCLUSION**

The Court, exercising its discretion, finds that Mr. Rosario has not shown cause for the

relief sought.   Accordingly, the Motion is **DENIED**.

Date:   March 23, 2023
Wilmington, Delaware


/s/ Eric M. Davis
**Eric M. Davis, Judge**


Original to Prothonotary:
cc:     Thomas A. Pedersen, Esq.
        Colleen Durkin, Esq., DAG
        The Prothonotary